Filed 4/14/25  P. v. Calderon CA2/6

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>RICHARD CALDERON,<br><br>    Defendant and Appellant. | 2d Crim. No. B333591<br>(Super. Ct. No. 2023002941)<br>(Ventura County) |

Richard Calderon appeals following a trial at which a jury convicted him of two counts of assault with force likely to produce great bodily injury (Pen. Code[1], § 245, subd. (a)(4); counts 1 and 3) and two counts of conspiracy to commit battery (§ 182, subd. (a)(1); counts 2 and 4).  After a bifurcated proceeding on aggravating factors, the court sentenced appellant to a total prison term of four years.

---

[1] Undesignated statutory references are to the Penal Code.

Appellant contends:  (1) the trial court erroneously admitted gang evidence; (2) the evidence was insufficient to prove conspiracy to commit battery, and those convictions violated due process; and (3) the pattern jury instruction on the meaning of "agreement" in a conspiracy was incorrect under the circumstances of this case.  We will affirm.

FACTUAL AND PROCEDURAL BACKGROUND

Appellant and cellmate Librado Ruiz were gang members who, according to in-custody gang rules, were under the more extensive Southern California Sureño gang umbrella while in custody.  After an in limine ruling admitting evidence of appellant's gang affiliation and one prior gang-related incident, the parties stipulated that, in April 2023, appellant "admitted engaging in criminal conduct on October 28, 2021, that was done for the benefit of and in association with a criminal street gang, Westside Locos, with the specific intent to promote, further, and assist in criminal conduct by gang members.  On April 18, 2023, [appellant] further admitted to being a member and active participant in the Westside Locos criminal street gang."  Appellant had "West Side" tattooed across his chest and "Locos" across his abdomen.

Each inmate entering the county jail was classified by sheriff deputies depending on factors like their commitment crime, sophistication level, or propensity for violence.  Each classification was associated with a color.  Red bands signified a violent history.  Orange bands denoted protective custody, which could include individuals like gang dropouts, law enforcement cooperators, and those convicted of domestic violence against women.

Gang members under the Sureño umbrella operated under their own rules and guidelines while in custody. Sureño gang members were obligated to act if a fellow member was in distress, had any issue, or was committing a crime. Such action did not require formal communication in advance; it could "operate[] . . . in the moment."

Sureños were bound to attack protective custody inmates. Additionally, if a Sureño had information that somebody was a potential or actual gang dropout, the Sureño would be expected to "handle the issue." The Sureño might tell the person to "roll it up," meaning tell classification they had been told to leave. If the person refused, the next step would be to assault them, essentially forcing a unit transfer.

*Alvaro H. Incident*

Alvaro H. once belonged to the South Side gang. The words "Sick Side," a reference to the gang, were tattooed on his face. Alvaro had since been "jumped out" of the gang—he "got beat up" and left the gang. He no longer considered himself a gang member when he entered jail in early 2023. He had been telling people he was no longer going to be part of the gang.

On February 3, 2023, Alvaro transferred to a housing unit that contained appellant and Ruiz. About 15 minutes after his arrival, Alvaro was aggressively approached as he headed to a shower. Alvaro saw "a couple hands" and fought back "all in self-defense." Alvaro testified he ended up in the fight because "[p]eople know me. People spread words about people. So somebody must have been—somebody knew I was in custody."

Sheriff's Service Technician Melissa Padilla monitored the inmates from a booth. She did not see how the fight involving Alvaro, Ruiz, and appellant began. She saw appellant and Ruiz

punching Alvaro, who was "in a ball-shaped form protecting his face from the punches . . . ."

Deputy Sheriff Angel Guerrero responded to the fight. Guerrero issued verbal commands to stop fighting, but the fight continued. Guerrero saw appellant and Ruiz punching and kicking Alvaro, who had his hands over his face. Guerrero never saw Alvaro strike either appellant or Ruiz.

Alvaro experienced swelling on his face and had some breathing difficulty. His eyeballs were injured. It took him around a month to fully recover. Alvaro did not recall telling a nurse he was jumped by two or more people. After the fight, appellant had a laceration to his left eyebrow, as well as blood on his cheek and left eyebrow.

At some point after the fight, Alvaro was rehoused to protective custody class. Responding to a hypothetical, Deputy Anthony Malagon agreed assault of a gang dropout or somebody who may be in questionable gang standing would be consistent with the understanding, motive, and desire to have that person removed from the section.

### Steven S. Incident

Steven S. had sustained convictions related to domestic violence and was housed in protective custody. One afternoon in April 2023, Steven was in a tunnel connecting the jail and the courthouse. Due to a miscommunication, jail staff allowed three red band individuals—appellant, Ruiz, and another inmate—into the tunnel with Steven. Steven was asked which band he was. As soon as they found out Steven's band, appellant and Ruiz immediately started "pounding on" him. Steven was both punched and kicked. Deputies eventually arrived and secured appellant and Ruiz.

4

After the attack, Steven experienced migraines.  His face was swollen and hurt.  His ribs were bruised.  Appellant and Ruiz had no apparent injuries.  In a hypothetical based on this incident, Deputy Malagon indicated the attack was consistent with how Sureños operate.

## DISCUSSION

### Admission of Gang Evidence

Appellant argues the gang evidence about him should have been excluded under Evidence Code section 1101 as substantially more prejudicial than probative.  We disagree.

Evidence Code section 1101 "limits the admissibility of so-called 'propensity' or 'disposition' evidence offered to prove a person's conduct on a particular occasion."  (*People v. Daveggio and Michaud* (2018) 4 Cal.5th 790, 822-823; Evid. Code, § 1101, subd. (a).)  This rule, however, does not prohibit admission of crimes or other acts to prove some other fact, such as motive or intent.  (Evid. Code, § 1101, subd. (b).)  If the evidence is relevant under Evidence Code section 1101, subdivision (b), "the trial court must next determine whether the evidence's probative value is 'substantially outweighed by the probability that its admission [would] . . . create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury.'"  (*People v. Chhoun* (2021) 11 Cal.5th 1, 26; Evid. Code, § 352.)

We review admission of evidence for abuse of discretion.  (*People v. Alvarez* (1996) 14 Cal.4th 155, 201.)  We will not disturb the trial court's ruling ""'"unless there is a showing that the trial court acted in an arbitrary, capricious, or absurd manner resulting in a miscarriage of justice."'""  (*People v. Mataele* (2022) 13 Cal.5th 372, 414.)

5

The limited gang evidence admitted here bore directly on appellant's motive and intent. "'"[B]ecause a motive is ordinarily the incentive for criminal behavior, its probative value generally exceeds its prejudicial effect, and wide latitude is permitted in admitting evidence of its existence."'" (*People v. McKinnon* (2011) 52 Cal.4th 610, 655 (*McKinnon*).) Without the gang evidence to elucidate appellant's incentives for acting and to provide context, the jury would have had difficulty making sense of his behavior. Moreover, the conspiracy counts required proof appellant intended to agree to commit battery. (§ 182.) Such intent would be opaque without a basic understanding of the gang backdrop.

Despite appellant's contrary assertion, the gang evidence was relevant to the motive and intent for the Alvaro H. incident. While the prosecution did not establish, "by direct means," that appellant knew Alvaro was a gang dropout or in bad standing, the circumstances permitted this inference. (*McKinnon*, *supra*, 52 Cal.4th at p. 656.) Alvaro had been telling people he was no longer going to be part of the gang. He had been jumped out of the gang. He testified "[p]eople spread words about people," and "somebody knew [he] was in custody." The rapidity of appellant's attack on Alvaro following his arrival substantiates this testimony. Especially given the possibility of a self-defense claim as to this incident, the gang evidence was highly probative of appellant's motive and intent.

Even if we assume the gang evidence was unnecessary to prove the assault on Steven S., any resulting error was harmless under any standard given the evidence's strength on that count. Indeed, appellant does not argue for reversal of that assault count. As for the remaining three counts, the gang evidence's significant probative value was not substantially outweighed by

any prejudicial effect of that limited, largely sanitized evidence. No abuse of discretion occurred as to any of those counts.

*Sufficiency of the Evidence*

Appellant argues the evidence is insufficient to sustain the conspiracy convictions. He urges federal constitutional and state law error. We conclude the evidence is sufficient. "Our task is clear. 'On appeal we review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.'" (*People v. Cravens* (2012) 53 Cal.4th 500, 507.) "In so doing, a reviewing court 'presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.'" (*People v. Avila* (2009) 46 Cal.4th 680, 701.) "'We do not reweigh evidence . . . . Resolution of conflicts and inconsistencies in the testimony is the exclusive province of the trier of fact.'" (*People v. Brown* (2014) 59 Cal.4th 86, 106.)

"Conspiracy "'is an inchoate offense, the essence of which is an agreement to commit an unlawful act.'" . . . This crime has four elements: (1) the existence of an agreement between at least two persons; (2) the specific intent to agree to commit an offense; (3) the specific intent to commit the offense that is the object of the agreement; and (4) an overt act in furtherance of the conspiracy, which may be committed by any conspirator." (*People v. Ware* (2022) 14 Cal.5th 151, 163 (*Ware*).) "'[I]t is not necessary to establish the parties met and expressly agreed; rather, "a criminal conspiracy may be shown by direct or circumstantial evidence that the parties positively or tacitly came to a mutual understanding to accomplish the act and unlawful design."'"

(*People v. Johnson* (2013) 57 Cal.4th 250, 264, italics omitted (*Johnson*).)

Substantial evidence supports the conspiracies to commit battery of Steven S. and Alvaro H.  Appellant and Ruiz were cellmates and both Sureños.  (See *Ware*, *supra*, 14 Cal.5th at p. 168 ["'[C]ommon gang membership may be part of circumstantial evidence supporting the inference of a conspiracy'"].)  Their gang affiliation could oblige them to attack gang dropouts or those in questionable standing (Alvaro H.).  That affiliation also required them to attack individuals classified as protective custody (Steven S.).  Appellant's and Ruiz's coordinated attacks imply agreements to fulfill their shared gang obligations.  (*People v. Thompson* (2016) 1 Cal.5th 1043, 1111, italics omitted ["'"The existence of a conspiracy may be inferred from the conduct, relationship, interests, and activities of the alleged conspirators before and during the alleged conspiracy"'"] (*Thompson*).)

Appellant maintains "[t]here was insufficient evidence of an agreement in this case because, as far as the evidence shows, it was at least as likely that appellant and Ruiz acted independently based on their Sureño training . . . as that they entered into an express or tacit prior agreement to act."  However, "[w]here the circumstances reasonably justify the trier of fact's findings, a reviewing court's conclusion the circumstances might also reasonably be reconciled with a contrary finding does not warrant the judgment's reversal."  (*People v. Zamudio* (2008) 43 Cal.4th 327, 358.)  Appellant's alternative explanation for the evidence does not justify reversal.

8

*Allegedly Erroneous Jury Instruction*

Pursuant to CALCRIM No. 415, the jury received this instruction: "An agreement may be inferred from conduct if you conclude that members of the alleged conspiracy acted with a common purpose to commit the crime." Appellant contends that "because action with a common purpose to commit a crime could exist in this case without a mutual understanding established in advance, and thus without an agreement, this instruction was incorrect in this case." We disagree.

"'An appellate court reviews the wording of a jury instruction de novo and assesses whether the instruction accurately states the law.'" (*People v. Lewis* (2023) 14 Cal.5th 876, 900.) "The challenged instruction is viewed 'in the context of the instructions as a whole and the trial record to determine whether there is a reasonable likelihood the jury applied the instruction in an impermissible manner.'" (*People v. Mitchell* (2019) 7 Cal.5th 561, 579.) "'A defendant challenging an instruction as being subject to erroneous interpretation by the jury must demonstrate a reasonable likelihood that the jury understood the instruction in the way asserted by the defendant.'" (*People v. Solomon* (2010) 49 Cal.4th 792, 822.) We review claims of instructional error de novo. (*People v. Thomas* (2023) 14 Cal.5th 327, 382.)

The challenged portion of CALCRIM No. 415 accurately states the law, and there is no reasonable likelihood the jury misunderstood or misapplied the instruction. CALCRIM No. 415 does not state an agreement *must* be inferred from conduct with a common criminal purpose. Nor does it indicate conduct with a common criminal purpose *alone* constitutes an agreement. Rather, the language merely identifies one category of evidence

9

the jury may use to infer an agreement.  (See *Thompson, supra*, 1 Cal.5th at p. 1111.)  This language does not suggest an agreement can exist without a mutual understanding.  (See *Johnson, supra*, 57 Cal.4th at p. 264.)  As to the relative timing of agreement and action, CALCRIM No. 415 explicitly instructed: "The overt act must happen after the defendant has agreed to commit the crime."

Counsels' argument further illuminated the instruction's meaning.  (*People v. Huggins* (2006) 38 Cal.4th 175, 193.) Regarding Steven S., the prosecutor argued appellant and Ruiz moved together and "shared a common purpose.  And from that, you can infer that there was a meeting of the minds.  That there was an agreement . . . ."  This statement delineates an agreement from conduct with a common purpose.  Likewise, defense counsel argued:  "The act itself doesn't show the meeting of the minds and be careful of that."  Although the court told the jury to follow the instructions if it believed the attorneys' comments conflicted with them, these arguments presented no such conflict.  Rather, the arguments reflected the instruction's commonsense meaning.

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED.

CODY, J.

We concur:

GILBERT, P. J.                BALTODANO, J.

10

Paul W. Baelly, Judge
Superior Court County of Ventura
_____

Jeffrey Manning-Cartwright, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Steven D. Matthews, Supervising Deputy Attorney General, and Amanda V. Lopez, Deputy Attorney General, for Plaintiff and Respondent.